In the Matter of ZACHARY MM., a Child Alleged to be Abused and/or Neglected. SULLIVAN COUNTY DEPARTMENT OF

FAMILY SERVICES, Appellant; ALLISON NN., Respondent. (Proceeding No. 1.) In the Matter of ZACHARY MM., a Child Alleged to be Abused and/or Neglected. SULLIVAN COUNTY DEPARTMENT OF FAMILY SERVICES, Appellant; CORY MM., Respondent. (Proceeding No. 2.) [714 NYS2d 557] —Graffeo, J. Appeal from an order of the Family Court of Sullivan County (Meddaugh, J.), entered October 25, 1999, which dismissed petitioner's applications, in two proceedings pursuant to Family Court Act article 10, to adjudicate Zachary MM. to be abused and/or neglected by respondents.

On November 18, 1998, after allegedly sustaining a head injury while at the home of his child care provider, respondents' three-month-old son was brought to a hospital emergency room and was diagnosed as having suffered a depressed skull fracture with subdural hematomas. At that time, 15 fractures to his ribs, legs and wrist were also detected. An investigation ensued and petitioner commenced separate proceedings pursuant to Family Court Act article 10 against respondents and the child care provider alleging each of these individuals was responsible for abuse and/or neglect of the child. The infant was placed in the care of his grandparents pending court proceedings.

After a combined fact-finding hearing, Family Court found that petitioner established that Zachary had been physically abused by his child care provider,* but the court dismissed the two petitions against respondents. Petitioner now appeals from the order dismissing those petitions.

In order to obtain a determination of abuse, petitioner must show by a preponderance of the evidence (*see,* Family Ct Act § 1046 [b] [i]; *Matter of Nicole V.,* 71 NY2d 112, 117; *Matter of Tammie Z.,* 66 NY2d 1, 3; *Matter of Kathleen OO.,* 232 AD2d 784, 785) that a respondent either "inflict[ed] or allow[ed] to be inflicted upon such child physical injury by other than accidental means" (Family Ct Act § 1012 [e] [i]) or created or allowed to be created a substantial risk of such physical injury (*see,* Family Ct Act § 1012 [e] [ii]). Where the preponderance of the evidence demonstrates that a child's physical, mental or emotional condition has been or is in danger of being impaired as a result of respondent's failure to exercise a minimum degree

---

* An order of disposition was entered with respect to the child care provider in January 2000. However, this individual is not a party to this appeal, nor is the abuse finding relating to the child care provider presently under review. We address the finding only insofar as it bears on the propriety of Family Court's determination dismissing the petitions against the child's parents.

of care, a neglect finding is warranted (*see,* Family Ct Act § 1012 [f] [i]; *Matter of Catherine P.,* 269 AD2d 702, *lv denied* 95 NY2d 751; *Matter of Kathleen GG. v Kenneth II.,* 254 AD2d 538, 539). Furthermore, there is a presumption that the parents or other caretakers responsible for an abused infant at the time the injuries were incurred are responsible for those injuries (*see,* Family Ct Act § 1046 [a] [ii]).

Upon our review of the record in this case, we concur with Family Court that the expert testimony presented by petitioner at the fact-finding hearing overwhelmingly established a prima facie case of child abuse. As a result of various diagnostic tests undertaken on November 18 and 19, 1998, including X rays, CT scans and MRIs, several medical experts determined that the child suffered a multitude of injuries over a three-week time period which, in their professional opinions, were caused by physical abuse. As none of the parties to this appeal contest the determination of abuse founded upon the expert medical testimony, the salient issue distills to which party or parties are responsible for the abusive or neglectful conduct.

Neither petitioner nor the child's Law Guardian dispute Family Court's determination that the depressed skull fracture was sustained while the infant was under the care of his baby-sitter. Indeed, the child care provider, in whose care the child had been placed for four days a week since early October 1998, acknowledged that the head injury occurred on November 18, 1998 at her apartment. She testified that she left the child unattended and asleep on her couch when she went to use the bathroom, leaving her eight-month-old daughter on the floor near the couch playing with rubberized barbells. Upon hearing the baby crying, she went to tend him, and found the infant lying on the floor near the couch. When she lifted him from the floor, she noticed an indentation in the back of his head, at which time she telephoned the child's mother. Shortly thereafter, the baby's father arrived and took him to the doctor's office. The child was subsequently diagnosed with a depressed skull fracture and subdural hematoma arising from that incident, which led to the discovery of other subdural hematomas and the 15 fractures in various stages of healing.

Based on expert medical testimony adduced at the hearing, Family Court discredited the child care provider's account of how Zachary sustained the depressed skull fracture. J.W. Harrington, a pediatrician, stated that the nature of the head injury was such that it could not have been inflicted without a greater degree of force than that which would be occasioned by the child having fallen from a couch, even if his head had

landed on a barbell. For purposes of this appeal, we find there was an adequate basis for Family Court's conclusion that the babysitter was responsible for the depressed skull fracture and the accompanying subdural hematoma, and that the injury did not occur in the accidental manner that she claimed but was a result of physical abuse.

Notwithstanding the finding of culpability relating to the child care provider, petitioner and the Law Guardian assert on appeal that Family Court erred in dismissing the abuse and/or neglect petitions against respondents. Having established at trial the nature of the infant's injuries and that the cause of such serious injuries was physical abuse, petitioner contends the burden of proof shifted to respondents, who failed to rebut the presumption of parental culpability. In light of the findings regarding the child care provider, respondents argue that petitioner failed to establish that they were responsible for any of their son's injuries.

Respondents, who took the stand themselves and presented the testimony of the infant's two treating pediatricians, denied having caused any of Zachary's injuries and contended they were not aware that he had sustained fractures or other injuries until November 18, 1998, the day he suffered the depressed skull fracture. They demonstrated that they had sought medical care for the infant on numerous occasions between September 15 and November 18, behavior which would not be expected from individuals who are abusing their child. In particular, the child's mother related that she had taken her son to the pediatrician's office on five occasions, and to the hospital emergency room, for various complaints including possible thrush, frequent crying, projectile vomiting and a bulging fontanel. She also solicited medical advice from NurseDirect, a call-in service, on two other occasions during that time frame.

In addition, respondents argued that their failure to discover the infant's injuries over the three week period from late October to November 1998 was understandable given the failure of trained medical personnel to identify his injuries. It is evident from the testimony presented that the physicians who examined the child on September 15, October 7, 15, 16, and 22, and November 4, 13 and 16 did not diagnose the infant with subdural hematomas or fractures. For instance, when the child's mother brought the child to the pediatrician on November 13, 1998 complaining that the fontanel on his head was bulging, she was referred to the hospital emergency room where a CT scan was taken. This led to an examination of the baby by yet another physician on November 16, 1998 but the

fractures and subdural hematomas remained undetected until November 18, 1998.

Notably, G. Preiser, one of the child's pediatricians, testified that he performed a physical examination of Zachary on October 16, 1998 which involved manipulation of the baby's legs but he did not notice any bruising, swelling or other signs of a fracture. He attributed the symptoms of crying to colic and recommended some dietary changes to address the problem. When he saw Zachary again on October 22, 1998, he found that the child's condition had improved. A second pediatrician consulted by the mother, Richard Gill, testified that he examined the baby on November 4, 1998 and concluded the complaints of crying and vomiting were attributable to a stomach virus or pyloristenosis. On November 16, 1998 an examination conducted by D.L. Benzil, a neurosurgeon, in connection with the fontanel complaint did not disclose the fractures, nor did this physician diagnose subdural hematomas at that time as he had not yet read the CT scan taken three days earlier.

Petitioner's own pediatrician, Harrington, opined that it was possible for a physician to fail to detect the types of fractures suffered by the infant despite conducting a physical examination since a full-body skeletal X ray would be necessary to diagnose such injuries. Harrington further indicated that a child of such a young age may not exhibit signs that fractures have been sustained, especially where, as here, the fractures were subacute, and that the crying or irritability exhibited by a child due to these injuries would be similar to that of a colicky infant.

Petitioner points to evidence that the infant suffered subdural hematomas on November 11, 1998 or November 12, 1998—dates petitioner contends the child was under the supervision of his mother and not the child care provider. In particular, petitioner relies upon the testimony of Benzil who concluded on the basis of the November 13, 1998 CT scan that some of the subdural hematomas had developed a day or two earlier, indicating such injuries were suffered by the child between November 11 and November 13, 1998. As the employment records of the child's mother show she was not at work on November 12, 1998 petitioner contends the proof established the infant was not with his babysitter when these subdural hematomas were inflicted.

However, a neuroradiologist, J.R. Zuback, estimated the age of these subdural hematomas to be "more than a week plus". Comparing the density of the fluids in the ventricles evident in the November 13, 1998 CT scan and a later scan taken on

November 24, 1998 Zuback determined the collections were denser than they would have been if the injuries had been inflicted within a day or two of November 13, 1998. He opined that at the time the first CT scan was conducted on November 13, 1998, the subdural hematomas evident on that scan could have been four to six days old.

In light of the variation in the expert testimony on this issue, we do not discern error in Family Court's apparent refusal to credit the testimony of Benzil over that of Zuback (see, Matter of Anthony YY., 202 AD2d 740, 742; Matter of Christine F., 127 AD2d 990, lv denied 69 NY2d 613). As it is undisputed the infant was with the child care provider for a portion of the day on November 10, 11 and 13, 1998, we find, for purposes of resolution of this appeal, that there is a basis in the record for Family Court's determination that she was also responsible for the subdural hematomas that appear on the November 13, 1998 CT scan.

Indeed, affording deference to the credibility assessments of Family Court as the trier of fact (see, Matter of Emily PP., 274 AD2d 681, 683; Matter of Kathleen OO., 232 AD2d 784, 785, supra), we see no reason to disturb the court's finding that the infant was in the care of his babysitter when he suffered the subdural hematomas and fractures, as such a determination was within the parameters of the expert and other testimony presented at the hearing. Although the child was also in his parents' care during the relevant time period, viewing the evidence as a whole and in consideration of the timing of the injuries and the finding that the child care provider abused the child, we conclude Family Court did not err in holding that petitioner failed to establish by a preponderance of the evidence that respondents abused Zachary, particularly in light of the fact that respondents repeatedly sought medical attention for their son. Moreover, based on the frequency of respondents' efforts to obtain medical assistance for Zachary and the diagnoses they received from the physicians who examined him, Family Court reasonably found that respondents were unaware that their son had suffered injuries until the skeletal X ray and other diagnostic tests were conducted after the incident in the child care provider's apartment. Thus, there was a basis in the record for Family Court's conclusion that the failure of respondents to remove their son from the babysitter's care before November 18, 1998 did not constitute neglect.

In sum, finding Family Court's determination that petitioner did not prove parental culpability by a preponderance of the evidence has a sound and substantial basis in the record (see,

*Matter of Anthony R. C.*, 173 AD2d 623; *see generally, Matter of Emily PP.*, 274 AD2d 681, *supra*), we affirm the dismissal of petitioner's applications against respondents.

Cardona, P. J., Peters, Carpinello and Mugglin, JJ., concur. Ordered that the order is affirmed, without costs.