*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  June 11, 2015                    518331
_____

In the Matter of NATALIE AA.
    and Another, Alleged to be
    Abused, Severely Abused and
    Neglected Children.

CLINTON COUNTY DEPARTMENT OF
    SOCIAL SERVICES,                         OPINION AND ORDER
                    Respondent;

KYLE AA.,
                    Appellant.

(And Another Related Proceeding.)
_____


Calendar Date:  April 21, 2015

Before:  Lahtinen, J.P., McCarthy, Garry and Rose, JJ.

                        _____


        Jessica C. Eggleston, Saratoga Springs, for appellant.

        Christine G. Peters, Clinton County Department of Social
Services, Plattsburgh, for respondent.

        Matthew Douthat, Plattsburgh, attorney for the children.

                        _____


McCarthy, J.

        Appeals (1) from two orders of the Family Court of Clinton
County (Lawliss, J.), entered September 27, 2013 and November 29,
2013, which, among other things, partially granted petitioner's
application, in a proceeding pursuant to Family Ct Act article
10, to adjudicate the subject children to be, among other things,
abused and neglected by respondent Kyle AA., and (2) from the

orders of protection issued thereon.

Respondent Kyle AA. (hereinafter the father) and respondent Amanda AA. (hereinafter the mother) are the parents of Natalie AA. (born in 2010) and Nora AA. (born in 2013).  In March 2013, while in the care of the father, Nora, then approximately seven weeks old, became flaccid and started turning blue.  After being taken to a local hospital, Nora presented with seizure activity. Physicians cumulatively diagnosed Nora with subdural hematomas, subarachnoid and retinal hemorrhages and intraventricular bleeding.  Petitioner thereafter commenced separate proceedings against the father and the mother, alleging neglect, abuse and severe abuse on the theory that Nora had suffered from abusive head trauma.  In September 2013, after a fact-finding hearing, Family Court dismissed the petition against the mother, but found that the father had neglected and abused Nora and had derivatively neglected and abused Natalie.  In October 2013, a one-year order of protection was entered against the father and, in November 2013, a dispositional order to the same effect was entered.  An order of protection of the same length was also entered that directed the mother to ensure that, among other things, the father was not left alone with the children.  The father now appeals from the September 2013 order, the two orders of protection and the November 2013 order.[1]

We agree with the father that petitioner failed to prove by a preponderance of the evidence that he abused and neglected Nora.  A child is abused when a parent inflicts "physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health" (Family Ct Act § 1012 [e] [i]; see Matter of Nicholas S. [John T.], 107 AD3d 1307, 1309 [2013], lv denied 22 NY3d 854 [2013]; Matter of Keara MM. [Naomi MM.], 84 AD3d 1442, 1443 [2011]).  A child is neglected when a parent's "failure . . . to

---

[1]  The appeals from the orders of protection must be dismissed given that those orders were entered upon consent (see Matter of Trenton G. [Lianne H.], 100 AD3d 1124, 1125 [2012]; Matter of Bianca QQ. [Kiyonna SS.], 75 AD3d 679, 681 [2010]).

exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship" results in the impairment or imminent risk of impairment of the child's "physical, mental or emotional condition" (Family Ct Act § 1012 [f] [i] [B]; see Matter of Javan W. [Aba W.], 124 AD3d 1091, 1091 [2015]; Matter of Cadence GG. [Lindsay II.], 124 AD3d 952, 953 [2015]).  "'[A] prima facie case of child abuse or neglect may be established by evidence of (1) an injury to a child which would ordinarily not occur absent an act or omission of [the] respondent[], and (2) that [the] respondent [was] the caretaker[] of the child at the time the injury occurred'" (Matter of Brayden UU. [Amanda UU.], 116 AD3d 1179, 1180 [2014], quoting Matter of Philip M., 82 NY2d 238, 243 [1993]; see Family Ct Act § 1046 [a] [ii]).  While a petitioner always bears the burden of proving abuse or neglect by a preponderance of the evidence, after a prima facie case has been established, it is incumbent upon the respondent to provide a reasonable explanation for the child's injuries (see Matter of Philip M., 82 NY2d at 244; Matter of Brayden UU. [Amanda UU.], 116 AD3d at 1180; Matter of Ameillia RR. [Megan SS.–Jered RR.], 112 AD3d 1083, 1084 [2013]).

Respondents' respective testimony established that Nora began exhibiting signs of injury while under the sole care of the father.  The father, a pediatric nurse, testified that, while he was changing Nora's diaper, she began to go limp and turn a shade of blue.  The father thereafter sought medical assistance, and Nora was transferred to a local hospital, where she presented with seizure activity.  The father denied that Nora was cranky that day, that he had been upset with her or that he had shaken, thrown or otherwise harmed her.

Daniel Anhalt, an emergency room doctor, was the first physician to see Nora upon her arrival at the hospital.  He testified that, at the time of Nora's arrival, she was exhibiting seizure activity, but that she was oxygenating well and did not have a fever.  Anhalt ordered certain tests to be done, one purpose of which was to look for any infection that could have caused the seizures.  Anhalt testified that the test results established, among other things, that Nora's white blood cell count was not elevated.  Anhalt testified that the results of the test did not show "any obvious signs of infection."  On cross-

examination, Anhalt admitted that Nora's white blood cell count was "very minimally elevated," to a degree that was not clinically significant. He testified that one reason that he concluded that such a count was not clinically significant was that seizure activity can raise white blood cell counts.

Anthony Ching, a pediatric specialist who also administered care to Nora on the day of the incident, testified that he tested her vital signs and reflexes, all of which were normal apart from intermittent seizures. Ching testified that respondents reported to him that Nora had colic. Based on the subdural hematoma, Ching concluded that Nora's injuries were the result of nonaccidental trauma. Matthew Adamo, a pediatric neurosurgeon, also evaluated Nora. He noted that a CAT scan, as well as an MRI, revealed a subdural hematoma and the presence of subarachnoid blood and intraventricular blood. From these results, Adamo diagnosed Nora with a possible traumatic brain injury – i.e., "an event that occurs with . . . some force to the brain that can either be [an] acceleration or a deceleration of the brain." Adamo further testified that he was familiar with the diagnosis of cortical venous thrombosis, which he described as a blood clot in one of the veins in the brain. He testified that cortical venous thrombosis was typically visible on a magnetic resonance venography scan and that such a scan of Nora did not show any evidence of that condition. However, Adamo modified that testimony to some extent and acknowledged that "[t]here may [have been] a small cortical venous thrombosis." He further stated that "a very small thrombosis is unlikely to cause any major bleeding," but also acknowledged that Nora's case was "not a large bleed." Adamo further testified that an MRI revealed that Nora had no swelling in the brain.

In addition, Adamo testified that he was unable to offer an explanation for the cause of Nora's condition. As to possible causes, Adamo asserted that the existence of a retinal hemorrhage in only one eye, as in Nora's case, is not diagnostic of either accidental or nonaccidental trauma, due to the possibility that such retinal bleeding is the result of blood that migrated from a different area. Comparing one-eyed retinal hemorrhages to bilateral retinal hemorrhages in reference to trauma, Adamo explained that "bilateral hemorrhages are much more common in

nonaccidental cases." Adamo opined that, without more, a fever and a viral infection would not cause hemorrhaging, but that such a result was possible if a patient also had a severe sinus or ear infection. Adamo acknowledged that Nora did not display any external signs of trauma.

The remainder of the medical testimony introduced at the hearing came in the form of expert testimony of physicians who had not directly treated Nora. Karyn Patno, a specialist in child abuse pediatrics, testified on behalf of petitioner. She opined that, to a reasonable degree of medical certainty, Nora had suffered subdural, subarachnoid, intraventricular and retinal hemorrhages, and that, because no reasonable explanation for such injuries had been provided, the cause was most likely abusive head trauma resulting from, at a minimum, shaking.[2] Joseph Scheller, a child neurologist, testified on behalf of the father. He opined that, to a reasonable degree of medical certainty, Nora had suffered a venous thrombosis, which led to bleeding that precipitated seizures and retinal hemorrhaging. The resolution of whether petitioner established that the father abused and neglected Nora or whether Nora suffered a spontaneous medical event largely rests on the resolution of the competing medical opinions from these highly credentialed medical subspecialists who had the greatest access and opportunity to review pertinent records and information related to Nora.

Patno and Scheller (hereinafter collectively referred to as the experts) primarily disagreed as to the reasonableness of the conclusion that an infant could be determined to have been shaken based on certain combinations of retinal hemorrhages, bleeding around the brain and brain swelling — despite the lack of evidence of external injuries, broken bones or neck injuries. Scheller testified that controlled laboratory experiments have never confirmed that the mechanism of shaking actually causes the specific injuries thought by some medical professionals to be sufficient to diagnose that an infant had been shaken. Patno agreed with Scheller, acknowledging that, for obvious ethical

---

[2]  Abusive head trauma is sometimes referred to as shaken baby syndrome.

reasons, "you can't do the experiment that you need to do to prove or disprove this whole theory." Scheller further testified that the laboratory experiments done on the topic — which are almost 30 years old and involved animal test subjects — attempted to replicate the mechanism that was theorized to cause shaken baby syndrome and could not do so by shaking alone. Patno disregarded such studies as unpersuasive due to methodological flaws. Patno further asserted that support for her conclusion that shaking is a mechanism that would cause the specific injuries that Nora presented comes from studies of the injuries to infants who people have confessed to having shaken.

Otherwise, the experts largely agreed as to the social factors that helped support or exclude a theory of nonaccidental trauma. Patno testified that, in making a diagnosis, she assessed risk factors associated with perpetrators and the victims of abusive head trauma. She testified that the father did not possess any of the risk factors that she considered relevant for a perpetrator of nonaccidental abusive head trauma.[3] Patno testified that Nora presented the single risk factor of being a fussy baby,[4] which Patno asserted was the most important risk factor to consider in diagnosing abusive head trauma.

Turning to the assessment of Nora's medical condition, the experts disagreed as to whether Nora exhibited signs of a fever and what weight such a potential fever would have in establishing a diagnosis consistent with a nonabusive cause of Nora's condition. Although there was no evidence that Nora had a fever when she first began receiving medical care, medical records established that, on the day after her hospital admission, Nora twice had a fever of approximately 100 degrees Fahrenheit, and

---

[3] According to Patno, the father was not uneducated, did not have a history of substance abuse, did not suffer from depression or attention deficit hyperactive disorder, had not indicated that Nora was an unwanted pregnancy and was neither a nonbiological father nor unmarried.

[4] Patno acknowledged that Nora was not born premature, did not have special needs, was not a male child and was not a twin.

the following day she exhibited a fever of 101.8 degrees Fahrenheit on two occasions. During that same period, medical records established that Nora was being given acetaminophen in the form of Tylenol. Patno testified that she only remembered seeing one temperature — a low temperature — in her review of Nora's medical records. She acknowledged that the medical records did not exclude the possibility that Nora had a viral condition. Presented with the hypothetical that Nora had a high temperature over a number of days while she was hospitalized, Patno agreed that such evidence would be relevant to the determination of whether Nora was suffering from a viral condition, although Patno also stressed that it would have to be put in context with other symptoms. Addressing the hypothetical, Patno opined that if Nora had a fever, that fact would not have changed her diagnosis.

In contrast, Scheller relied on the medical record evidence that indicated that Nora had a fever and emphasized its importance. Scheller explained that fevers irritate the brain and that seizures represent that the surface of the brain has been irritated. He further explained that infants who develop blood clots do so as a result of a triggering illness that is characterized by a fever. Scheller, more so than Patno, stressed that he found the lack of findings as to Nora's medical condition important to his diagnosis. Specifically, he emphasized the importance of the facts that Nora had no broken bones and no neck injuries, that there was no evidence that Nora had bumped her head and that Nora's brain was not swollen. Patno did not dispute these facts. In addition, only Scheller addressed the specific pattern of bleeding on the surface of Nora's brain. Scheller explained that Nora had more blood in a compartment closer to the surface of the brain than a compartment further from the surface of the brain. He explained that he would expect to see the majority of blood in compartments further from the surface of the brain when a subject suffers a traumatic head injury and the majority of blood in compartments closer to the surface of the brain when a subject suffers an internal problem such as a clotting disorder.

In addition, the experts disagreed as to whether the one-sided retinal hemorrhage indicated nonaccidental abuse rather

than some nonabusive event. Scheller testified that the fact that Nora had a single-sided retinal hemorrhage that occurred on the same side as the subarachnoid hemorrhage indicated that the former hemorrhage was the result of blood migration from the latter hemorrhage; the single-sided retinal hemorrhage was likely a result of the subarachnoid hemorrhage and, therefore, not a symptom that independently supported a diagnosis of abusive head trauma. He further opined that it was difficult to imagine why, if retinal hemorrhaging was the direct result of shaking, only one eye would have hemorrhaging, given that both eyes would be shaken equally. Patno agreed that retinal hemorrhaging in both eyes, compared to that in just one eye, was more common in cases of a shaken infant, but offered no opinion as to whether, in her view, such one-sided hemorrhaging supported an abusive head trauma diagnosis as opposed to a venous thrombosis diagnosis or was merely not inconsistent with the abusive head trauma diagnosis. Finally, the experts disagreed as to whether Nora exhibited an abnormally high white blood count, which would indicate that her blood clotted more slowly than an average infant. Patno testified that Nora's count was minimally elevated, at most, and that such elevation could have been a result of the seizures. Scheller emphasized that such count was abnormally high and that a blood clotting condition was more consistent with his diagnosis.

In its September 2013 fact-finding order, Family Court explicitly credited all of petitioner's physician witnesses and explicitly credited the evidence that the father had led a productive and law-abiding life and was generally a good parent. Family Court concluded, however, that Scheller's expert testimony was unpersuasive, stating that Scheller's assertion that scientific experiments did not support that Nora's injuries could be caused by shaking was "contrary to common sense," because "no study is going to be performed in which young babies are shaken violently to determine exact[ly] what injuries are likely to be caused."[5] We defer to the aforementioned credibility

_____

[5] We discern no basis for Family Court's apparent conclusion that such evidence made Scheller's testimony unpersuasive. Patno explicitly agreed with Scheller that such

determinations but independently review the weight of the competing expert evidence.

As to that review, the uncontested evidence showed that Nora did not suffer external trauma (compare People v Smith, 41 AD3d 964, 966 [2007], lv denied 9 NY3d 881 [2007]), broken bones or neck injuries (compare Matter of Joaquin Enrique C. [Anna Julia F.], 79 AD3d 548, 548-549 [2010]; People v Maddox, 31 AD3d 970, 972 [2006], lv denied 7 NY3d 868 [2006]; People v Yates, 290 AD2d 888, 888 [2002]; Matter of Brandon C., 247 AD2d 380, 381 [1998]), and she had a one-sided retinal hemorrhage (compare People v Smith, 41 AD3d at 966; People v Yates, 290 AD2d at 888). Further, the father, a professional pediatric nurse, exhibited none of the characteristics thought to be diagnostically predictive of a perpetrator of abusive head trauma (compare Matter of Seamus K., 33 AD3d 1030, 1033 [2006]), and he consistently denied that he mishandled Nora (compare People v Kendall, 254 AD2d 809, 809 [1998], lv denied 92 NY2d 983 [1998]; People v Jones, 236 AD2d 217, 218 [1997], lv denied 89 NY2d 1036 [1997]). The single characteristic that Nora was fussy — while perhaps almost always present in victims of abusive head trauma — fails to meaningfully support Patno's diagnosis over Scheller's diagnosis, given the vast number of fussy infants who are never physically abused. Further, while Patno testified that abusive head trauma from shaking often results in a triad of symptoms that include subdural hematoma, retinal hemorrhaging and brain swelling (see generally People v Hershey, 85 AD3d 1661, 1662 [2011], lv denied 18 NY3d 883 [2012], cert denied ___ US ___, 132 S Ct 2692 [2012]), the medical evidence uniformly established that Nora did not suffer from brain swelling. Additionally, Scheller and Adamo — petitioner's witness — were substantially in agreement that Nora's single-sided retinal hemorrhaging could be

---

studies had not been performed in a laboratory setting. The fact that it would be unethical and illegal to perform such studies cannot support an assumption that, if such studies had been done, they would have shown that shaking causes the symptoms that include those exhibited by Nora. The uncontested limitations of the scientific support for the diagnosis of abusive head trauma cannot be held against the father.

the specific result of the subdural hematoma, rather than a direct result of any potential trauma. Patno failed to offer any explanation regarding the merits of such a theory or even an opinion as to whether she believed that such one-sided retinal hemorrhaging was the direct result of shaking (compare Del Prete v Thompson, 10 F Supp 3d 907, 932 [ND Ill 2014]). Accordingly, given Patno's lack of specificity regarding the one-sided retinal hemorrhage, it is unclear whether she believed that evidence of a fussy infant who had suffered a subdural hematoma was, by itself, sufficient to diagnose abusive head trauma.

We agree with Family Court that Patno's expert opinion that Nora suffered an injury while in the father's care that would not have occurred in the absence of his actions was sufficient to establish petitioner's prima facie case (see Matter of Izayah J. [Jose I.], 104 AD3d 1107, 1108 [2013]; Matter of Alexander F. [Raddad I.], 82 AD3d 1514, 1516-1517 [2011]; Matter of Seamus K., 33 AD3d at 1032). However, contrary to Family Court's assessment, we find Scheller's expert testimony, which was consistent with conclusions of Nora's treating physicians and her medical records in crucial respects, offered a reasonable and persuasive account of how Nora's symptoms — and lack thereof — better supported his venous thrombosis diagnosis. This evidence provided a reasonable explanation for Nora's injuries that did not implicate the father. Based on Scheller's testimony, and mindful of the fact that petitioner had the burden of proof, we cannot conclude that petitioner established by a preponderance of the evidence that the father caused Nora's injuries so as to support a finding that he abused and neglected her (see Matter of Marquise W., 269 AD2d 400, 400 [2000]). In addition, because the derivative abuse and neglect findings in regard to Natalie were dependant on the findings of direct abuse and neglect of Nora, those derivative findings are also unsupported by the record (see Matter of Leon K. [Marilyn O.], 69 AD3d 856, 857-858 [2010]; see e.g. Matter of Randy AA., 265 AD2d 690, 692 [1999]).

Lahtinen, J.P., Garry and Rose, JJ., concur.

ORDERED that the appeals from the orders of protection entered October 21, 2013 are dismissed, without costs.

ORDERED that the orders entered September 27, 2013 and November 29, 2013 are modified, on the law, without costs, by reversing so much thereof as granted petitioner's application with respect to respondent Kyle AA.; petition dismissed in its entirety; and, as so modified, affirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court