OPINION OF THE COURT
Emily M. Olshansky, J.
Factual Background and Procedural Background
1. Procedural History of the Educational Neglect Petition
On October 2, 2007, New York City Children’s Services (hereinafter NYCCS) filed a petition against respondent mother alleging that her son Jamol’s physical, mental or emotional condition had been impaired or was in imminent danger of becoming impaired, as a result of her failure to exercise a minimum degree of care in supplying him with an adequate education in accordance with the provisions of part I of article 65 of the Education Law. Specifically, the petition alleges that Jamol missed 44 days of school during the 2006-2007 school year and 18 days during the 2007-2008 school year.
On the day the petition was filed, Jamol was paroled to respondent under NYCCS supervision on the condition that she ensure that he attend school daily absent a medical excuse. Issue was joined on October 19, 2007.
The fact-finding hearing was conducted on July 29, 2008, November 17, 2008 and January 7, 2009. NYCCS called one witness, Stephanie Thompson, a caseworker, on its direct case. Ms. Thompson testified that the original oral report transmission (hereinafter ORT) was received from the Children’s Aid Society on June 14, 2007. That day, NYCCS convened a case conference. Respondent attended that conference and initially rejected NYCCS’s offer of services since she did not believe that they would be effective. Two days later, however, she contacted Ms. Thompson to say that she would do anything she could to help improve Jamol’s school attendance. Ms. Thompson described two services that were offered by NYCCS to assist Jamol, the Teen Enhancement Program, and Rise Up and Walk. Jamol, however, never agreed to participate in either program.
*774 Ms. Thompson provided no testimony about Jamol’s school performance or his absences. Her testimony was limited to a description of her initial contacts with respondent and Jamol.
The proof with respect to educational neglect consisted solely of the records that NYCCS introduced into evidence including the ORT dated June 14, 2007 (petitioner’s exhibit 1 in evidence), Jamol’s school records from the 2006-2007 and 2007-2008 school years (petitioner’s exhibit 2 in evidence), the ORT dated September 18, 2008 (petitioner’s exhibit 3 in evidence), the ORT dated November 21, 2008 (petitioner’s exhibit 4 in evidence), and Jamol’s school records from the 2007-2008 school year (petitioner’s exhibit 5 in evidence).[1] Jamol’s school records establish numerous unexcused absences during the period prior to the filing of the petition. For the 2006-2007 school year, Jamol attended ES. 582 during September 2006. An attendance sheet from ES. 582 indicates that Jamol was absent seven days that month (with a medical excuse having been provided for two of those days) and late five times.
After that he was enrolled in ES. 71 from October 2006 to January 2007. An attendance sheet from ES. 71 indicates that Jamol was absent eight days in October 2006 and late once and that he was absent eight days in November 2006. There is no indication in the records that he missed any school in December or the beginning of January, although the records indicate that he was late on January 18, 2007.
Thereafter Jamol was suspended for fighting.[2] After his suspension, Jamol attended ES. 252 in February 2007. An attendance sheet from ES. 252 indicates that Jamol was absent four days in February 2007. After that, he was transferred to a “suspension school,” ES. 607 or the Sankofa Academy, from February 2007 until January 2008. An attendance sheet from the Sankofa Academy indicates that he was absent from school *775 59 days from February 2007 until June 2007 and 72 days from September 2007 to January 2008.
Respondent mother testified on her own behalf. She works for the Department of Health where she “writes decisions, defaults or . . . whatever things the judges send to [her] office.” In addition, she attends Medgar Evers College where she is studying behavioral science. Although Jamol’s father, Augusta F., does not live with respondent and Jamol, he is actively involved in the child’s life. Mr. F. attended school conferences, brought the child to school when respondent was unavailable and, after the parents decided to file a person in need of supervision (hereinafter PINS) petition, he attended the first meeting at the Children’s Aid Society.
Respondent testified that she first learned that Jamol was skipping school in 2006, when a friend saw him playing basketball on a school day. She described the efforts that she and Jamol’s father then made in an attempt to ensure that their son attended school every day. She testified that she immediately contacted school authorities to inquire about the extent of the problem. After that, she maintained ongoing contact with school personnel to monitor his attendance. She and Jamol’s father repeatedly met with school officials, at times more frequently than once per week.
Respondent spoke with Jamol repeatedly about the importance of completing his education. She tried to set an example for him by attending college herself. She took away his privileges. She removed his PlayStation from his room as well as other games, his DVD player, his cable television and Internet connection. She discontinued his allowance and, in an effort to ensure that he did not return to the house after she went to work, she took away his keys.
In addition, respondent woke Jamol up every morning. She stopped sending him to school by bus. She drove him to school. When she was unavailable to drive him, Jamol’s father would pick him up and take him to school. After the parents drove him to school, they left him in the care of the principal or the school security guard.
Respondent also attempted to obtain home schooling for Jamol without success. She testified about the discussions she had with various individuals from the Board of Education. She testified that home schooling was not a viable option for Jamol since it would require that she be at home when the tutor was present, which would ultimately have resulted in her losing her job.
*776 She also testified that she attempted to have Jamol transferred to a different school after he stopped attending the Sankofa Academy. She described the substance of her discussions with individuals from the Board of Education who informed her that the transfer options were limited since Jamol was already attending a suspension school. Respondent testified that there was only one suspension school in each borough and she therefore realized that this alternative was unworkable. According to respondent, “how was I going to get him to go to school in the Bronx when I couldn’t even get him to go in Brooklyn.” Ultimately she enrolled him in private school, the St. George H. Murphy Academy, for the 2008-2009 academic year. Respondent testified that Jamol started school there on September 3, 2008 and that he attended until October 16, 2008. On that date, he left school grounds without permission and was terminated. After that, respondent and Jamol’s father tried for several months before they were able to enroll him in a different school.
During their many meetings with school personnel, school officials had little concrete advice for the parents although they eventually suggested that they file a PINS petition. When respondent went to Family Court to file the petition, the case was diverted and respondent was referred to the Children’s Aid Society.
On April 10, 2007, Jamol and his father attended the first meeting at the Children’s Aid Society. They were told about the PINS diversion process and were offered mediation and counseling.
On April 26, 2007, respondent and Jamol attended the second meeting at the Children’s Aid Society. They were offered individual and family counseling. Jamol refused to participate. For that reason and because of the failure of their prior efforts, respondent and Jamol’s father concluded that further discussions about counseling would be fruitless. Respondent testified that despite Jamol’s attendance problems, he was promoted in June of 2007 and in June of 2008.
Respondent mother also called Anna Espada to testify on her direct case. Ms. Espada works with Advocates for Children providing educational advocacy and parent training. Respondent mother sought to qualify Ms. Espada as an expert in “suspension schools.” That application was denied since Ms. Espada had never met Jamol, respondent or the nonrespondent father and she had never reviewed any trial transcripts, the *777 pleadings, the child’s school records or any other documentation concerning the Family Court case. Accordingly, the court concluded that the proposed opinion testimony was without an adequate foundation.[3]
On its rebuttal case, NYCCS called Jenny McCaughey, from the Children’s Aid Society. Ms. McCaughey testified that nonrespondent father first brought Jamol to the Children’s Aid Society on April 10, 2007, seeking help because the parents were unable to get their son to go to school. The father indicated that he was seeking to pursue a PINS case. According to Ms. Mc-Caughey, she next had a session on April 26, 2007 with respondent and Jamol at which she offered them individual and family counseling. She scheduled a follow-up visit for May 8, 2007. That visit was cancelled, as was the rescheduled visit on May 22, 2007. On June 14, 2007, she called in an ORT. Thereafter, on June 19, 2007, Ms. McCaughey attempted, without success, to make a home visit. She then closed the case.
At the conclusion of the fact-finding hearing, respondent mother and the attorney for the child moved to dismiss the petition asserting that NYCCS failed to prove neglect pursuant to Family Court Act § 1012 (f) (i) (A) and that, in any event, the aid of the court is not required pursuant to Family Court Act § 1051 (c).
2. Subsequent Family Court Proceedings
On December 9, 2008, a delinquency case was filed against Jamol alleging that he committed acts which, if committed by an adult, would constitute criminal mischief in the fourth degree (index No. D-36228/08). According to the petition, on October 18, 2008, Jamol and another boy approached a store at 691 Broadway in Brooklyn and the owner closed the front door. One of the boys then kicked the front glass door causing it to shatter.
Respondent and Jamol were both present in court on the date the petition was filed. On December 10, 2008, issue was joined *778 and counsel was assigned. Respondent and Jamol were both present in court on that date as well.[4]
On February 9, 2009, another delinquency case was filed against Jamol alleging that he committed acts which, if committed by an adult, would constitute petit larceny and criminal possession of stolen property in the fifth degree (index No. D-01889/ 09). According to the petition, on January 30, 2009, Jamol and another boy were arrested after they were stopped and accused of stealing gum and candy from a store located at 783 Manhattan Avenue in Brooklyn.
On the date the petition was filed, Jamol failed to appear in court and Honorable Nora Freeman issued a warrant for his arrest. On February 19, 2009, although respondent mother appeared in court, Jamol did not and the warrant for his arrest was continued. Both matters were adjourned to March 17, 2009.
On March 17, 2009, Jamol appeared with respondent and the warrant was vacated. Index No. D-36228/08 was withdrawn. With respect to index No. D-01889/09, Jamol made an admission to the charge of criminal possession of stolen property in the fifth degree and that case was adjourned to May 12, 2009 for disposition.
On March 18, 2009, Jamol was arrested again. On March 19, 2009, another delinquency case was filed against him alleging that he committed acts which, if committed by an adult, would constitute petit larceny and criminal possession of stolen property in the fifth degree (index No. D-07216/09). On March 19, 2009, that case was adjourned in contemplation of dismissal for a period of six months. The conditions of the adjournment in contemplation of dismissal were that Jamol comply with the commands of his parents, comply with his curfew, attend school daily, refrain from committing any illegal acts and refrain from using drugs or alcohol.
3. Questions Presented
In the instant case, NYCCS presented a prima facie case of educational neglect by introducing certified and delegated school records documenting excessive unexcused absences. The burden *779 of going forward shifted to respondent to rebut NYCCS’s prima facie case. The parties differ on whether respondent has satisfied that burden.
NYCCS argues that she did not. NYCCS asserts that the documentary evidence establishes a prima facie case and that the burden of going forward thereafter shifted to respondent to demonstrate that the child was either attending school or receiving the required instruction in another place. NYCCS suggests that once the educational records were introduced and respondent failed to establish that the child was receiving the required instruction, the court was required to presume parental failure and harm or potential harm to the child. In any event, NYCCS asserts that even if a prima facie case can be rebutted by evidence that the parent exercised a minimum degree of care, respondent in this case failed to submit sufficient evidence. Finally, NYCCS asserts that absent a PINS adjudication, the court is precluded from finding that the child is beyond respondent’s ability to control. Since here, it is undisputed that Jamol missed an excessive number of school days and that he did not consistently attend an alternate school or receive home instruction, NYCCS asserts that a finding of educational neglect is required.
Respondent and the attorney for the child disagree. They assert that educational neglect is not a strict liability offense. They contend that proof of a prima facie case creates only a permissible inference of parental failure and impairment or imminent risk of impairment. They assert that proof of educational neglect also requires a showing of harm or imminent risk of harm that is clearly attributable to the parent’s failure to exercise a minimum degree of care. Accordingly, they contend that a prima facie case can be rebutted by evidence that the parent exercised reasonable care and that the child is beyond the parent’s ability to control. They assert that in the instant case, the child’s failure to attend school is not attributable to any unwillingness on respondent’s part to exercise reasonable care. Indeed, they assert that respondent has done everything possible to ensure that the child attended school but that her efforts were unsuccessful since he is beyond her ability to control. Finally, they emphasize that Jamol was promoted at the end of each academic year and that, therefore, there is no evidence of actual impairment.
After careful consideration of counsel’s oral arguments, current case and statutory law, and all of the evidence and other *780 papers submitted, the court finds that respondent has rebutted NYCCS’s prima facie case.
Legal Analysis
1. Family Court has Jurisdiction over all Cases Involving Alleged Violations of Article 65 of the Education Law
Article 65, part I of the Education Law, specifically section 3205 (1) (a), requires that all children between the ages of 6 and 16 attend school on a full-time basis. Education Law § 3205 (3) grants to cities of a certain size the power to require minors from 16 to 17 years of age who are not employed to attend full-time day instruction. In New York City, the Chancellor of the Board of Education has promulgated a rule making full-time attendance compulsory for unemployed minors through age 17 (Chancellor’s Regulation A-101 [I] [B]). Thus, in New York City, children from ages 6 to 17 are required to attend school on a full-time basis.
Upon a violation of part I of article 65, the Family Court is granted subject matter jurisdiction (Education Law § 3232), whether the violation is caused by the child (see Family Ct Act §§ 713, 712 [a]) or the parents (see Family Ct Act § 1012 [f] [i] [A]). If the child is repeatedly absent without the knowledge of his or her parents, it may constitute truancy and generally is not a basis for a neglect finding, unless the nonattendance can be traced to the attitudes or actions of the parents. Nonattendance, in which the child is repeatedly absent from school with the parent’s knowledge and without appropriate action on his/her part, may be a basis for a neglect finding. In other words, if a child refuses to attend school, a PINS petition may be filed. If a parent interferes with a child’s efforts to attend school, a neglect petition may be the appropriate recourse. Although the statute requires every parent to send his/her school-age child to school, it specifically exempts from compliance any parent whose child is beyond his/her ability to control (Education Law § 3212 [3]).
2. Establishing a Prima Facie Case of Educational Neglect
The Family Court Act defines an educationally neglected child as a child less than 18 years of age, whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired, as a result of the failure of the parent to exercise a minimum degree of care in supplying the child with an adequate education in accordance with the provisions of part *781 I of article 65 of the Education Law (Family Ct Act § 1012 [f] [i] [A]).[5]
[6]
Proof that a minor child is not attending public or parochial school in the district in which the parent resides makes out a prima facie case of educational neglect (Matter of Dareth O., 304 AD2d 667 [2d Dept 2003]; Matter of Christa H., 127 AD2d 997 [4th Dept 1987]). Proof of a prima facie case does not, however, create a conclusive presumption of parental culpability or risk of impairment. It simply creates a permissible inference that the finder of fact may choose to draw upon all the evidence in the record. It does not compel a finding in accordance with that inference (see Matter of Ashley RR., 30 AD3d 699, 700 [3d Dept 2006], citing Kambat v St. Francis Hosp., 89 NY2d 489, 495 [1997]; Matter of Christian Q., 32 AD3d 669, 671 [3d Dept 2006]). The Family Court is always required to weigh all the evidence in the record before making a determination regarding neglect (id.; Matter of Philip M., 82 NY2d 238, 244, 246 [1993]; Matter of Ashley RR., 30 AD3d at 700-701). Indeed, the statute *782 specifically requires proof of “habitual truancy.” Therefore, isolated instances of unexcused absences will not support a neglect finding. It is only when the number of absences reaches the extreme and continues for an extended period of time without parental action that an inference of impairment may be drawn (Commissioner of Social Servs. [Maria M.], 161 Misc 2d 600 [Fam Ct, Kings County 1994]; Matter of Alexander D., 45 AD3d 264 [1st Dept 2007]; Matter of Jennifer N., 173 AD2d 971 [3d Dept 1991]).
Furthermore, the statute requires proof that the parent failed to exercise a minimum degree of care in ensuring that the child attended school and impairment or imminent danger of impairment to the child. Proof of impairment or potential impairment alone is not enough. Proof of parental failure is also required (Matter of Jennifer N. at 972 [the statute contemplates a showing of both parental misconduct and harm or potential harm to the child]; Matter of Alexander D., 45 AD3d 264 [2007], supra [a child’s unexcused absence from school does not, ipso facto, establish either the parental misconduct or the harm or potential harm to the child necessary to support a finding of educational neglect]). In the words of the Court of Appeals “[t]he statute is fault based” (Matter of Philip M., 82 NY2d at 243; Matter of Christopher Anthony M., 46 AD3d 896, 898 [2d Dept 2007]; Matter of M/B Child, 8 Misc 3d 1001[A], 2005 NY Slip Op 50884[U], *2 [Fam Ct, Kings County 2005]; Matter of Kevin T., 181 Misc 2d 386, 391 [Fam Ct, Kings County 1999]). Consequently, “[n]o one ... is made liable without some fault or negligence on his [or her] part, however serious the [resulting] injury may be” (Losee v Buchanan, 51 NY 476, 488 [1873]). For this reason, allegations of abuse or neglect must be dismissed where there is no evidence that the parent failed to exercise a minimum degree of care, even where there is actual impairment to the child including physical injury (see e.g. Matter of Myriam L., 17 Misc 3d 1125[A], 2007 NY Slip Op 52147[U] [Fam Ct, Kings County 2007] [child protective proceeding dismissed where the child’s skull fracture was caused by an accident]; Matter of Christopher Anthony M., 46 AD3d 896 [2007] [child protective proceeding dismissed where injury could reasonably have occurred accidentally]; Matter of Eric G., 99 AD2d 835 [2d Dept 1984] [child protective proceeding dismissed where the infant’s fractured femur could have occurred by accident]; Matter of Brandyn P., 278 AD2d 533 [3d Dept 2000] [petition dismissed where the spiral fracture of the one-year-old infant’s leg was caused by an accidental fall rather than abuse]).
*783 The statute also requires proof of a causal connection between the parental failure and the impairment or risk of impairment (Matter of Coleen P, 148 AD2d 782, 784 [3d Dept 1989]). In fact, the harm or risk of harm to the child must be “clearly attributable to the unwillingness or inability of the [parent] to exercise a minimum degree of care” (Family Ct Act § 1012 [h]; Matter of Jennifer N., 173 AD2d at 972). This rule applies with particular force where, as here, the alleged impairment is to the child’s emotional or mental condition. As the Court of Appeals has emphasized, in such cases, “[t]he Legislature recognized that the source of emotional or mental impairment — unlike physical injury — may be murky, and that it is unjust to fault a parent too readily.” (Nicholson v Scoppetta, 3 NY3d 357, 370 [2004].) The Legislature therefore specified that “such impairment must be clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care toward the child” (id. [emphasis added]).
3. Rebutting a Prima Facie Case of Educational Neglect
Once NYCCS has established a prima facie case, the burden of going forward or the burden of explanation shifts to respondent to present proof challenging the prima facie evidence of neglect (Matter of Christian Q., 32 AD3d at 671; Matter of Philip M., 82 NY2d at 244). The burden of going forward does not shift the burden of proof, which always rests with NYCCS to prove neglect by a preponderance of the evidence (see Matter of Seamus K., 33 AD3d 1030 [3d Dept 2006]; Matter of Philip M., 82 NY2d at 244).
In order to rebut a prima facie case, respondent may come forward with evidence that the child is attending school or receiving the required instruction in another place (Matter of Christa H., 127 AD2d at 997). Respondent may also rebut a prima facie case by establishing “a reasonable justification for the child’s absences” (Matter of Brian H., 2 Misc 3d 1003[A], 2003 NY Slip Op 51715DJ], *2 [Fam Ct, Kings County 2003]; Matter of Jennifer N., 173 AD2d 971 [1991] [respondent provided a reasonable justification where the child was under a doctor’s care during the relevant time and returned to school once respondent obtained approval from the child’s physician]; Matter of Angelique W., Fam Ct, Kings County, Aug. 6, 2007, Elkins, J.; Commissioner of Social Servs. [Maria M.], 161 Misc 2d 600, 611 [1994]).
A prima facie case may also be rebutted by evidence that the parent has exercised a minimum degree of care {Matter of Jes *784 sica Y., 161 AD2d 368 [1st Dept 1990] [although the child missed 142 school days during a 12-month period, the parents exercised a minimum degree of care by attempting to enroll the child in a private school]; Matter of Giancarlo P., 306 AD2d 28 [1st Dept 2003] [a child’s prolonged unexcused absence from school does not establish either parental misconduct or potential harm to the child where the parent was actively engaged with school authorities in securing an appropriate special education placement for the child, and the child’s education was not adversely affected by his absence]; Matter of Alexander D., 45 AD3d at 264 [where the parent was actively engaged in securing an appropriate special education placement for the child, and there was no evidence that the child’s education was adversely affected by his absence from school, educational neglect was not established]; Matter of Christopher UU., 24 AD3d 1129 [3d Dept 2005] [petition dismissed where the parent was actively engaged with school authorities in securing an appropriate special education placement for the child, and there was no evidence that the child’s education was adversely affected by his absence from school or that he was placed at imminent risk of harm]).
4. NYCCS has Established a Prima Facie Case of Educational Neglect that Respondent has Rebutted
In the instant case, NYCCS presented a prima facie case by introducing Jamol’s school records. The burden of going forward then shifted to respondent to rebut the prima facie case. Based on the evidence adduced, the court finds that respondent successfully rebutted the prima facie evidence by establishing that she exercised a minimum degree of care and that the child was beyond her ability to control. The court rejects the assertion of Children’s Aid Society that a prima facie case can only be rebutted by evidence that the child is attending school or receiving the required instruction elsewhere.
The statute defines child neglect as harm or a risk of harm to a child that is clearly attributable to a respondent’s failure to exercise a minimum degree of care. The statute is fault-based (Matter of Philip M., 82 NY2d at 243). Accordingly, a prima facie case can always be rebutted by evidence that respondent exercised a reasonable degree of care and that the harm or risk of harm is not clearly attributable to any acts or omissions on her part. There is no educational neglect exception to this general rule and if the Legislature had intended to create such an exception, it would have done so explicitly.
In this regard, respondent’s efforts included attempting to correct her son’s behavior by talking to him and setting an *785 example. In addition, she maintained ongoing contact with school officials and met with them repeatedly. She woke Jamol up each morning. She or Jamol’s father drove him to school and left him with appropriate school authorities. She made reasonable efforts to discipline him by removing the games, music, television, and Internet connection from his room. She took away his keys, denied him other privileges and discontinued his allowance. After Jamol stopped attending the Sankofa Academy, respondent actively engaged with school authorities in attempting to secure an appropriate placement for him. When those efforts were unsuccessful, she enrolled him in private school. After he was expelled from private school, respondent again engaged with school authorities in attempting to secure a different educational placement for him.
Despite these efforts, Jamol left school grounds the moment he was unattended. He fought with other students. He was suspended from public school and expelled from private school. After that he was repeatedly arrested. He failed to abide by the agreement he made with respondent mother and probation and failed to comply with the orders of Judge Freeman.
In the instant case, the alleged risk of impairment is to the child’s emotional or mental condition. Because the source of such risk may be uncertain and because of the Legislature’s determination that it is unjust to fault parents too readily, such risk must be “clearly attributable to the unwillingness or inability of the respondent to exercise a minimum degree of care” (Nicholson v Scoppetta, 3 NY3d at 370 [emphasis added]). No such showing has been made here. Indeed, here, there is no showing that respondent has failed to exercise reasonable care.[6]
Imposing liability without fault has no precedent under the Family Court Act or relevant case law. The purpose of article 10 is “remedial, not punitive” in nature. Its goal is to protect the physical, mental and emotional well-being of the child, not punish the parent (Commissioner of Social Servs. [Maria M.], 161 Misc 2d at 607 [the purpose of a child protective proceeding is to protect children from injury or mistreatment and safeguard their physical, mental, and emotional well-being; that purpose is subverted when it is used to punish parents in the name of child protection]; Matter of Jessica FF, 211 AD2d 948 [3d Dept 1995]; Matter of Jessica C., 132 Misc 2d 596 [Fam Ct, Queens *786 County 1986]; Matter of Linda S., 148 Misc 2d 169 [Fam Ct, Westchester County 1990]; Matter of Theresa C., 121 Misc 2d 15 [Fam Ct, Monroe County 1983]).
In the instant case, the entry of a finding of neglect against respondent will serve no remedial purpose. Since the commencement of this proceeding, the court has entered numerous orders against respondent directing that she ensure that Jamol attend school on a daily basis absent a medical excuse. Although she has repeatedly attempted to comply with those orders, her efforts have been unsuccessful. Additional orders directed against respondent will be equally ineffective since, in the view of this court, respondent is demonstrably unable to control her son’s actions. There is no suggestion that there are other children in the home or that respondent requires services for any other reason. Although NYCCS and the court have been involved with the family for 17 months, Jamol’s attendance has not improved. Where, as here, the processes of the Family Court cannot help in achieving the remedial purpose of the statute, court intervention becomes unnecessary, perhaps counterproductive and even punitive.
5. Respondent’s Failure to Participate in Additional Services at the Children’s Aid Society does Not Support a Finding of Neglect
Finally, the court rejects the assertion that respondent’s failure to participate in additional sessions at the Children’s Aid Society supports a finding of neglect. Respondent was under no obligation to participate in services which she and Jamol’s father, in good faith, believed would not be helpful to their son. Unless that decision constituted a failure to exercise a minimum degree of care which resulted in the child’s physical, mental or emotional condition being impaired or being placed in imminent danger of becoming impaired, it does not support a finding of neglect.
In this regard, it is significant that NYCCS did not plead that respondent’s actions constituted a failure to exercise a minimum degree of care (see Nicholson v Williams, 203 F Supp 2d 153, 171 [ED NY 2002] [dismissing allegations of neglect based on respondent’s failure to cooperate with services that were offered where there was no specific indication of how such failure constituted neglect]). Further, although they have had 17 months to do so, NYCCS never sought to amend the petition to include that allegation. Nor did NYCCS prove that respondent’s actions constituted a failure to exercise a reasonable degree of *787 care. As respondent testified, she and Jamol’s father took Jamol to the Children’s Aid Society because they wished to commence a PINS proceeding on the advice of school officials. Once they learned that the Children’s Aid Society could not assist them in this way and that Jamol would not agree to engage in services, they decided not to participate. They were never informed that they were required to participate in additional sessions or comply with recommendations for mediation and counseling. They were never told that failure to comply would result in the filing of a report of suspected child maltreatment — let alone a child protective proceeding. The parents apparently believed that they had the authority to reject recommendations for services that they believed would not be helpful to their family. They were not required to do otherwise.
By the time the parents concluded that further discussions about therapy and mediation would be futile, Jamol had already refused to participate. He had already been involved in a number of fights in school. He had already been suspended from school for fighting. He had already refused to attend the suspension school. Efforts to enroll him in a different suspension school or obtain home schooling had been unsuccessful. Efforts to modify his behavior by speaking with him, denying him privileges and delivering him directly to school authorities had been ineffective. Under these circumstances, a reasonably prudent parent could certainly have concluded that therapy and mediation would not be helpful. Moreover, there is no rational basis for concluding that respondent’s decision caused or contributed to Jamol’s nonattendance.
Conclusion
This decision has been made only after a painstaking consideration of the facts, the law and common sense. It should not be read as condoning Jamol’s short-sighted and ill-considered decision not to attend school.[7] Nor should it be interpreted as an endorsement of the parent’s decision to decline *788 PINS diversion services. It is simply a determination that NYCCS has failed to prove the required elements of educational neglect and that a neglect finding against respondent will not serve any remedial purpose.
Accordingly, the petition is dismissed since respondent rebutted the prima facie evidence of neglect. In addition, the petition is dismissed since a workable dispositional order simply cannot be fashioned in this case.
Accordingly, it is ordered, that the motion to dismiss the petition is granted.

. The petition was filed on October 2, 2007. Accordingly, Jamol’s school records for almost all of the 2007-2008 school year relate to a period after the filing of the petition. The court permitted all parties to introduce limited evidence pertaining to this period since respondent and the attorney for the child indicated that they would be moving to dismiss the petition at the conclusion of the fact-finding hearing pursuant to Family Court Act § 1051 (c), on the ground that the aid of the court was no longer required. Since much of the information relevant to this inquiry arises out of evidence that was obtained after the filing of the petition (see Wade, Practice Insights, NY CLS, Book 44, Family Ct Act § 1051, 2008 Cum Supp), the court allowed it for that limited purpose.

. According to respondent’s testimony, Jamol had been in several fights in school and was badly hurt during one of them.

. That conclusion was based on several factors. First, the testimony would have been speculative and unsupported by any evidentiary foundation and therefore of no probative force. Second, the testimony would have been based on material assumptions not supported by the evidence. Third, the testimony could not have been based on the witness’s personal knowledge of the facts, material in evidence or information the witness learned from another witness who was subject to cross-examination (see Wagman v Bradshaw, 292 AD2d 84 [2d Dept 2002]; Matter of D’Esposito v Kepler, 14 AD3d 509 [2d Dept 2005]; Nuzzo v Castellano, 254 AD2d 265 [2d Dept 1998]). Accordingly, the proposed testimony was held to be inadmissible.

. On January 2, 2009, respondent and Jamol met with a probation officer and entered into an agreement whereby Jamol promised to obey his parents, comply with his curfew, call his probation officer every night, cooperate with his probation officer, attend school daily, refrain from committing any illegal acts and perform 20 hours of community service at McCarran Park, New York City Housing Authority. According to court documents, to date, Jamol has not cooperated with any of these conditions.

. Family Court Act § 712 (a) defines a “person in need of supervision” as a person less than 18 years of age who does not attend school in accordance with part I of article 65 of the Education Law or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of a parent, or other lawful authority. In order to establish that a child is beyond the control of his/her parent, there must be proof that the parent exercised proper supervision and made reasonable efforts to prevent the child from committing or continuing such acts. In addition, before a child may be declared as a person in need of supervision, based on the failure to attend school regularly, there must be proof that the child willfully and intentionally failed to attend school, in violation of the state’s compulsory education laws (Matter of Simon v Doe, 165 Misc 2d 379 [Fam Ct, Seneca County 1995]; Matter of Barbara M., 130 Misc 2d 20 [Fam Ct, Nassau County 1985]; Besharov, Practice Commentary, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 712 [1998]). Before a parent is permitted to file a PINS petition, he/she is required to participate in diversion services. The purpose of diversion services is to utilize alternatives to detention and “diligently attempt to prevent the filing of a petition” (Family Ct Act § 735 [b] [ii]). The statute provides that a PINS petition cannot be accepted for filing unless it is accompanied by a notice from a diversion service provider indicating that the parent consented to and actively participated in diversion services and that it has terminated services because there is no substantial likelihood that the child and his family will benefit from further attempts (see Family Ct Act §§ 735, 712). The statutory requirement that a parent participate in diversion services before he/she may be permitted to file a PINS petition has been widely credited for the recent reduction in PINS filings. What remains unclear, however, is whether diversion services have been any more successful than court intervention in resolving the underlying problems facing the child and the parents. Aso unclear is what alternatives exist for a parent whose child refuses to participate in diversion services if the parent is unable to compel the child to do so, e.g., where the child is, in fact, beyond the parent’s ability to control.

. Moreover, since Jamol was promoted to the next grade at the end of each academic year, there is no evidence of actual impairment.

. Jamol’s truancy is of great concern to this court, as it is to his parents and NYCCS. The negative consequences of adolescent truancy have been well-documented. Links between truancy and delinquency have been delineated in research conducted by the Office for Juvenile Justice and Delinquency Prevention (2001). High rates of truancy have been linked to high daytime burglary and vandalism rates, as well as higher rates of substance abuse, auto theft, and gang involvement (R. Loeber and D. Farrington, Young Children who Commit Crime: Epidemiology, Developmental Origins, Risk Factors, Early Interventions, and Policy Implications-, 12 Dev & Psychopathology [No. 4], at 737-762 [2000]; see also S. Ingersoll and D. LeBoeuf, Reaching Out to Youth *788 Out of the Education Mainstream, Juvenile Justice Bulletin, Office of Juvenile Justice and Delinquency Prevention [Feb. 1997]). Students with the highest truancy rates are at the greatest risk of dropping out of school (K. Nauer, A. White and It. Yemeni, Strengthening Schools by Strengthening Families, Center for New York City Affairs, Milano the New School for Management and Urban Policy [Oct. 2008]; Manual to Combat Truancy, U.S. Department of Education and Department of Justice [1996]). Adults who do not complete high school are 2V2 times more likely to support themselves with public assistance than high school graduates and almost twice as likely to be unemployed as those who graduated from high school (U.S. Deptartment of Labor [1999]). Adults who were truant as juveniles, tend to have lower paying jobs and an increased likelihood of incarceration (J.D. Hawkins and R. Catalano, Risk Focused Prevention: Using the Social Development Strategy, Developmental Research and Programs Inc. [1995]). Unfortunately, these negative consequences are likely to have an impact on thousands of children in New York City alone. According to New York City’s attendance tracking system more than 90,000 children or 20% of the total number of students enrolled in kindergarten through 5th grade missed at least one month of school in 2007-2008. For all grades it was 121,517 or 11.9%. For 9th grade through 12th grade it was 84,254 children or 24% (New York City Department of Education [July 2008]). The number of such cases that are brought to the attention of child protective authorities and that require court intervention has increased dramatically in recent years. In 2006, school personnel called in almost 20,000 ORTs. In 2007, there were almost 18,000 reports (State Central Registry Intake Reports from NYCCS, 2002-2007). Approximately 38% of those reports were deemed serious enough for NYCCS to intervene (State Central Registry Intake and Indication Rate Report from NYCCS for 2007).